523 A.2d 618

**Joseph Hooper McAVOY**

v.

**STATE of Maryland.**

**No. 841 Sept. Term, 1986.**

Court of Special Appeals of Maryland.

April 9, 1987.

Thomas A. Garland, Ellicott City, for appellant.

Ann E. Singleton, Asst. Atty. Gen., Stephen H. Sachs, Atty. Gen., Baltimore, Thomas E. Hickman, State's Atty., for Carroll County and Edward M. Ulsch, Deputy State's Atty., for Carroll County, on brief, Westminster, for appellee.

Submitted before BISHOP, ROSALYN B. BELL and KARWACKI, JJ.

KARWACKI, Judge.

Joseph McAvoy, the appellant, was convicted in the Circuit Court for Carroll County of driving while under the influence of alcohol in violation of Md.Code (1977, 1984 Repl.Vol.), § 21–902(b) of the Transportation Article. He was sentenced to 60 days imprisonment and fined $250. The court suspended the prison sentence and placed the appellant on supervised probation for three years. In this appeal he contends that Judge Robert H. Heller, Jr., should have granted his pretrial motion to suppress the results of a breathalyzer test and evidence of the appellant's inability to perform certain field sobriety tests because those tests were administered without compliance with the dictates of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

At the hearing on the motion to suppress, the following testimony was presented concerning the events leading up

to the appellant's arrest on February 28, 1984. Trooper M.A. DiPietro of the Maryland State Police testified that at approximately 8:00 p.m. that evening, he observed the appellant's automobile make a "right turn on red" from Green Street into the northbound lane of Route 32 where a sign was posted prohibiting such a maneuver. Trooper DiPietro, who had been proceeding south on Route 32, turned his police cruiser around and followed the appellant's car through the streets of Westminster as the appellant drove from Route 32 to the unlit parking lot of the VFW clubhouse located on Poole Road. Trooper DiPietro alighted from his vehicle, approached the appellant, and informed him that he had made an illegal right turn. The appellant maintained, however, that there was no sign prohibiting a right turn on a red light at the Green Street-Route 32 intersection. Trooper DiPietro then suggested that they both drive back to the scene to resolve their conflicting observations. The appellant agreed. Upon their arrival at the Green Street-Route 32 intersection, Trooper DiPietro and the appellant parked their vehicles in a well lighted parking lot near the intersection and walked to a place near the roadway from which the "No Turn on Red" sign was clearly visible. At this point the trooper noticed that the appellant "had watery eyes and a flushed face and his eyes were bloodshot, and ... that he had an alcoholic beverage odor on his breath." Trooper DiPietro's testimony continued:

Q Now when you made those observations, what happened then?

A I asked him if he'd recite the alphabet after I ascertained that he did know it.

Q All right.

A He made four attempts to do so and he could never get past P.

Q All right. Did you ask him to do any other field tests?

A  I demonstrated the finger-to-nose test that I use and he made, I think it was, three attempts and even after I corrected him on the three attempts as to how I wanted it done, which is with the feet together and the head tilted back and the arms brought from the side to the front and then straight back to the nose, he still just brought his hands up from his waist to his face.  Even when I would correct him right in the middle of it he would still do it that way.

Q  All right.  Did you have any other tests other than the alphabet test and the finger-to-the-nose test?

A  No, he said he had ankle problems so I didn't attempt any balance tests.

The appellant was then placed under arrest at 8:30 p.m. for driving while intoxicated.  After the DR15 form[1] was

---

1.  A standardized statement of the rights of a motorist under the implied consent statute and the penalties for refusal to submit to a chemical test provided for by Md.Code, *supra,* § 16–205.1 of the Transportation Article.  The form provides:

> Any person who drives a motor vehicle on a highway or on any private property that is used by the public in general in this state is deemed to have consented, with certain limitations, to take a Chemical Test to determine the alcohol content of his blood.
>
> Pursuant to law, I am hereby advising you that you have been stopped or detained on reasonable grounds on suspicion that you have been driving or attempting to drive a motor vehicle while intoxicated or while under the influence of alcohol.  I am further advising you that Maryland Law requires the type of test to be administered shall be the chemical test of breath except that the chemical test of blood shall be the type of test administered if:
>
> (1) The defendant is unconscious or otherwise incapable of refusing to take a chemical test for alcohol;
>
> (2) Injuries to the defendant require removal of the defendant to a medical facility or
>
> (3) The equipment for administering the chemical test of breath is not available.
>
> The results of such test may be admissible and may be considered with other competent evidence in determining your guilt or innocence in any prosecution relating to your driving or attempting to drive a motor vehicle, while either intoxicated or under the influence of alcohol.
>
> That you have the right to refuse to submit to the test and on your refusal, no test shall be administered.

read to the appellant by Trooper DiPietro, the appellant agreed to take a breathalyzer test. He was transported to the State Police barracks in Westminster, and a breathalyzer test was administered to the appellant at 9:09 p.m., resulting in a finding of .20 percent ethyl alcohol by weight in his blood.[2] *Miranda* rights were read to the appellant at 9:35 p.m., and after the appellant declined to make a statement, he was released. At no time during his detention at the scene or after his arrest had the appellant requested the right to see or communicate with a lawyer.

The appellant's testimony at the hearing on the motion to suppress contradicted several aspects of Trooper DiPietro's testimony. The appellant claimed that he was ordered, not invited, back to the Green Street-Route 32 intersection to view the "No Turn on Red" sign, that he was not asked to perform an "alphabet test" or a "finger-to-nose test," and that he was told that he would have to take the breathalyzer test and therefore never consented to the test. The appellant also maintained that he was not read the Advice of Rights form prior to being given the breathalyzer test.

---

That your refusal to submit to a chemical test shall result in administrative penalties being imposed that may include a suspension of your driver's license and/or driving privilege for not less than 60 days nor more than 6 months for a first offense and not be less than 120 days nor more than 1 year for a second or subsequent offense.

That after submitting to a chemical test administered at the request of the arresting officer, you may also have a physician of your choice to administer a chemical test in addition to the one administered at the direction of the police officer.

I have read or have been read the Advice of Rights for Chemical Test and have been advised of administrative penalties that shall be imposed for refusal to take test. I understand that this requested test is in addition to any preliminary road-side test that was taken. Having been so advised, do you now agree to submit to a Chemical Test to determine the alcohol content of your blood? (This is not an admission of guilt.)

2. A finding of .08 percent constitutes prima facie evidence of driving under the influence of alcohol and a finding of .13 percent is prima facie evidence of driving while intoxicated. Md.Code (1974, 1984 Repl.Vol.), § 10–307(d) and (e) of the Courts and Judicial Proceedings Article.

All of these conflicts were resolved in favor of the testimony of Trooper DiPietro by the hearing judge when denying the motion to suppress.

In *Miranda v. Arizona,* the Supreme Court held that in criminal trials in the federal and state courts: "... the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444, 84 S.Ct. at 1612, 16 L.Ed.2d at 706–07. The procedural safeguards which the Court mandated to protect the Fifth Amendment[3] privilege that "[n]o person ... shall be compelled in any criminal case to be a witness against himself" are the now well-known warnings which must be given to any criminal suspect before any custodial interrogation.

The progeny of *Miranda* has recognized that these warnings have no constitutional basis, but that they are prophylactic rules created by judicial decision to safeguard the privilege against self-incrimination. *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 2363–64, 41 L.Ed.2d 182, 192–93 (1974); *Whitfield v. State,* 287 Md. 124, 131, 411 A.2d 417, *cert. dismissed,* 446 U.S. 993, 100 S.Ct. 2980, 64 L.Ed.2d 850 (1980)[4]; *State v. Kidd,* 281 Md. 32, 36–37, 375 A.2d 1105, *cert. denied,* 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977). Thus, preliminary to any decision to exclude evidence because it was gathered from the criminal

---

3. The privilege is applicable in state prosecutions by virtue of the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

4. In *Whitfield,* the Court of Appeals held that a prisoner's statement concerning the location of a gun at the jail where he was confined was not admissible because he had not been given his *Miranda* warnings, reasoning that the emergency situation created by the presence of a gun in a prison provided no exception to the mandates of *Miranda.* It appears, however, that the Supreme Court subsequently recognized an emergency exception to *Miranda* in *N.Y. v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), ostensibly overruling *Whitfield's* holding.

suspect who was not advised of his *Miranda* rights is a determination of whether that evidence constitutes a statement stemming from custodial interrogation.

■ With these principles in mind, we turn initially to the appellant's attempt to suppress the results of the breathalyzer test administered to him at the Westminster barracks of the State Police. It is well established that the Fifth Amendment privilege only protects an accused from being compelled to provide evidence of a testimonial or communicative nature. It is inapplicable where, as here, the suspect provides real or physical evidence under compulsion. *Schmerber v. California,* 384 U.S. 757, 761, 86 S.Ct. 1826, 1830–31, 16 L.Ed.2d 908, 914 (1966); *State v. Moon,* 291 Md. 463, 473–74, 436 A.2d 420 (1981). In *Schmerber* the Court rejected a claim by a convicted drunken driver that the results of a test determining the percentage of alcohol in his blood, administered after his arrest, should not have been admitted at his trial because the blood had been drawn from him over his objection based upon the privilege against self-incrimination. Justice Brennan, speaking for the Court, reasoned:

> It is clear that the protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. *Boyd v. United States,* 116 U.S. 616 [, 6 S.Ct. 524, 29 L.Ed. 746.] On the other hand, both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling "communications" or "testimony," but that compulsion which makes a suspect or accused the source of "real or physical evidence" does not violate it. (Footnotes omitted.)

384 U.S. at 763–64, 86 S.Ct. at 1832, 16 L.Ed.2d at 916. Whether the accused is a donor of blood or breath for testing to determine the percentage of ethyl alcohol in his or her blood, no testimony or communication is compelled within the ambit of the protection afforded by the Fifth Amendment. An overwhelming number of the courts which have addressed this issue have so concluded. *See, e.g., People v. Mulack,* 40 Ill.2d 429, 240 N.E.2d 633 (1968); *Commonwealth v. Brennan,* 386 Mass. 772, 438 N.E.2d 60, 63–64 (1982); *State v. Macuk,* 57 N.J. 1, 268 A.2d 1 (1970); *People v. Gielarowski,* 58 Misc.2d 832, 296 N.Y.S.2d 878 (N.Y.Dist.Ct.1968); *Heer v. Department of Motor Vehicles,* 252 Or. 455, 450 P.2d 533 (1969); *State v. Bunders,* 68 Wis.2d 129, 227 N.W.2d 727 (1975). We agree and therefore hold that an individual who is arrested for driving while intoxicated or while under the influence of alcohol is not entitled to the warnings mandated by *Miranda v. Arizona* prior to being given the option of submitting to the blood-alcohol tests authorized by Md.Code, *supra,* § 16–205.1 of the Transportation Article.

We also conclude that Trooper DiPietro's testimony describing the appellant's performance of certain field sobriety tests was properly admitted in evidence at his trial notwithstanding the failure of the trooper to warn him of his *Miranda* rights before administering the tests. We ground this holding on either of the following: (1) at the time the tests were administered, the appellant was not being subjected to a *custodial interrogation,* and (2) the results of the tests were not *testimony or communications* compelled from him.

In *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Court addressed the question of whether the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered custodial interrogation within the scope of *Miranda.* The motorist in *Berkemer* was stopped by a state highway patrolman who had observed his automobile being operated in an erratic manner. When the motorist got out of his

vehicle in compliance with the officer's order, he had difficulty standing. Although the officer suspected that the motorist was intoxicated, he did not inform him at that point that he would be taken into custody. Rather, he requested that the motorist perform a field sobriety test. Based upon the motorist's poor performance of this test, his staggering gait and his slurred speech, the officer arrested him. Prior to being arrested, the motorist, in response to questions from the officer, admitted that he had consumed alcoholic beverages and that he had smoked marijuana shortly before the traffic stop. In holding that this pre-arrest questioning was not custodial interrogation triggering the necessity of *Miranda* warnings, the Court reasoned:

Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced "to speak where he would not otherwise do so freely." *Miranda v. Arizona,* 384 U.S. [436] at 467[, 86 S.Ct. 1602, 16 L.Ed.2d 694.] First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. In this respect, questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek. See *id.,* at 451[, 86 S.Ct. 1602, 16 L.Ed.2d 694.]

Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some

pressure on the detainee to respond to questions. But other aspects of the situation substantially offset these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. In short, the atmosphere surrounding an ordinary traffic stop is substantially less "police dominated" than that surrounding the kinds of interrogation at issue in *Miranda* itself, see 384 U.S., at 445, 491–498[, 86 S.Ct. 1602, 1617, 1636–1640, 16 L.Ed.2d 694,] and in the subsequent cases in which we have applied *Miranda.* (Footnotes omitted.) 468 U.S. at 437–39, 104 S.Ct. at 3149–50, 82 L.Ed.2d at 333–34. Consequently, the dictates of *Miranda v. Arizona* were inapplicable to any evidence provided by the appellant prior to his arrest. For an exhaustive discussion of when "custodial interrogation" occurs within the meaning of *Miranda,* see *Whitfield v. State, supra.*

■ Moreover, even assuming that the appellant was subjected to custodial interrogation when he was asked to recite the alphabet and to perform the finger-to-nose test, we would hold that his performance of those tests was not compelled self-incrimination protected by the Fifth Amendment. We believe that the analysis applied above to the results of the breathalyzer test is fully applicable to the evidence of how well the appellant was able to perform simple tests of his physical coordination and verbal articulation, both of which are affected by alcohol consumption. Because performance of these tests did not reveal any subjective knowledge or thought processes of the appellant, he did not thereby supply the State any testimony or communication within the protection of his privilege against

self-incrimination. This view accords with that reached by a vast majority of the courts which have considered the issue. *See, e.g., State v. Theriault,* 144 Ariz. 166, 696 P.2d 718 (App.1984); *People v. Ramirez,* 199 Colo. 367, 609 P.2d 616 (1980); *Oxholm v. District of Columbia,* 464 A.2d 113 (D.C.App.1983); *Commonwealth v. Brennan, supra; Piqua v. Hinger,* 15 Ohio St.2d 110, 238 N.E.2d 766, *cert. denied,* 393 U.S. 1001, 89 S.Ct. 484, 21 L.Ed.2d 466 (1968); *State v. Haefer,* 110 Wis.2d 381, 328 N.W.2d 894 (App.1982).

Finally, we reject the appellant's assertion that the recent decisions of the Court of Appeals in *Brosan v. Cochran,* 307 Md. 662, 516 A.2d 970 (1986), and *Sites v. State,* 300 Md. 702, 481 A.2d 192 (1984), compel a result contrary to the one which we reach in the instant case. In *Sites* the Court held that:

> ... the due process clause of the Fourteenth Amendment, as well as Article 24 of the Maryland Declaration of Rights, requires that a person under detention for drunk driving must, *on request,* be permitted a reasonable opportunity to communicate with counsel before submitting to a chemical sobriety test, as long as such attempted communication will not substantially interfere with the timely and efficacious administration of the testing process.

300 Md. at 717–18, 481 A.2d 192 (emphasis supplied).

In *Brosan* the Court, explicating *Sites,* held that the right of the accused drunken driver to consult with counsel, upon requesting such assistance, included the right to face-to-face consultation with his lawyer rather than mere telephone communication and that the attorney had the right to administer his own breathalyzer test to his client before advising his client whether to submit to a police administered test. The Court emphasized that these rights must be exercised in such a manner as not to interfere substantially with the timely and efficacious administration of the State's testing process.

.

In neither case was the Court concerned with the scope of *Miranda* in the setting of the detention and subsequent arrest of a suspected drunken driver. The cases are simply inapposite to the issues presented to us in the case *sub judice*.

JUDGMENT AFFIRMED;

COSTS TO BE PAID BY THE APPELLANT.